```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------X
JOHN L. JOHNSON,

                Plaintiff,

                                        MEMORANDUM AND ORDER

        -against-
                                        13-CV-3745 (KAM)
CAROLYN W. COLVIN,

Commissioner of Social Security,

                Defendant.
---------------------------------------X
```

**MATSUMOTO, United States District Judge:**

Plaintiff John L. Johnson commenced this action on July 1, 2013 against Commissioner of Social Security Carolyn Colvin ("Defendant") seeking judicial review of a decision of the Social Security Administration ("SSA") pursuant to 42 U.S.C. § 405(g) and/or 42 U.S.C. § 1383(c)(3). Plaintiff alleges that he is entitled to, and was denied, disability benefits related to cervical and lumbar degenerative disc disease and post-traumatic stress disorder. (ECF No. 1, Complaint ("Compl.") at 4.)

Defendant has moved for judgment on the pleadings and filed a memorandum in support. (ECF No. 22, Defendant's Memorandum of Law in Support of Defendant's Motion for Judgment on the Pleadings ("Def. Mem.").) Plaintiff filed a cross-motion for judgment on the pleadings. (ECF No. 19, Plaintiff's Motion for Judgment on the Pleadings ("Pl. Mot.").) Defendant then filed a reply brief and an opposition to plaintiff's cross-motion. (ECF

No. 23, Reply Memorandum of Law in Support of Defendant's Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Cross-Motion ("Def. Reply").) This matter is now fully briefed and the cross-motions are ripe for resolution by the court.

For the reasons stated below, Defendant's motion is GRANTED and plaintiff's motion is DENIED.

**BACKGROUND**

## I.    **Procedural History**

This case involves plaintiff's application for Supplemental Security Income ("SSI") filed in October 1984 as well as his application for disability insurance benefits filed in September 1989. The suit has an unusually lengthy history in large part due to a class action settlement — *see Stieberger v. Sullivan*, 801 F. Supp. 1079 (S.D.N.Y. 1992) — that required the Social Security Administration ("SSA") to acquiesce in Second Circuit precedents. This contributed to multiple reopenings of the proceedings in plaintiff's case and placed this court in the position of evaluating a decades-old claim for social security benefits.

Plaintiff first filed an application for SSI on October 26, 1984. The application was denied at the initial level and at the reconsideration level in November 1984. Plaintiff did not request an ALJ hearing. Plaintiff reapplied for SSI in September

1998 and was awarded disability benefits with a disability onset date of September 1, 1998.

Plaintiff also filed an application for disability insurance benefits on September 1, 1989, alleging a disability that began on February 9, 1984. (Tr. 79.) Plaintiff alleged that he was disabled due to back injury, neck injury, knee injury, migraine headaches, blackouts, and poor vision caused by seven accidents. (Tr. 79.) The application was denied initially and on reconsideration. (Tr. 92, 104.) Plaintiff subsequently appeared with counsel before ALJ Jonathan Jacobs. (Tr. 43–60.) On April 3, 1991, ALJ Jacobs found plaintiff not disabled prior to September 30, 1990, plaintiff's date last insured, and through the date of the decision. (Tr. 12, 352.)[1] On December 26, 1991, the Appeals Council remanded the case to permit plaintiff to cross-examine Dr. C. Sharma, a neurological consultative examiner. (Tr. 24, 352.)

On remand, however, at a hearing in April 1992, ALJ Jacobs denied plaintiff's request to cross-examine Dr. Sharma because a second neurological consultative examination had been obtained, and plaintiff's counsel agreed. (Tr. 65.) In a decision dated May 15, 1993, the ALJ subsequently found plaintiff not disabled and the Appeals Council denied review. (Tr. 10-19, 352.)

---

[1] Certain decisions throughout the history of this litigation – including this one by ALJ Jacobs – could not be located by the parties. (*See* Def. Mem. at 4 nn. 4-5, 5 n.7.) Where a decision is absent from the record, the court has used other record evidence to substantiate the relevant procedural history.

Plaintiff sought review of this decision in the district court, which remanded the case for further administrative proceedings pursuant to the *Stieberger* settlement. (Tr. 244.)

The *Stieberger* settlement, as the Second Circuit has explained,

> was developed as a remedy for the effects of the SSA's "non-acquiescence policy," under which ALJs were essentially told to disregard the law of this Circuit on certain issues when adjudicating disability claims. The settlement agreement required the Commissioner to provide a New York statewide class with notice and opportunity to request the reopening of, and new decision on, disability claims that were denied or terminated at any administrative level between October 1, 1981 and October 17, 1985, and were decided at the administrative law judge or Appeals Council level between October 7, 1981 and July 2, 1992.

*Shaw v. Chater*, 221 F.3d 126, 136 (2d Cir. 2000). Under the terms of the *Stieberger* settlement, the period for evidentiary development (the "Development Period") generally begins 48 months prior to the date of the SSA's receipt of a class member's request for *Stieberger* reopening. *See Nolfi v. Astrue*, No. 10-CV-349, 2011 WL 3475852, at *3 (W.D.N.Y. Aug. 9, 2011); *Stieberger*, 801 F. Supp. at 1081, 1091; *see also* Social Security Administration, Office of Hearings and Appeals, Litigation Law Manual ("HALLEX") I-5-4-13.VIII.B.1-3. The Development Period ends, as relevant here, when the plaintiff becomes entitled to social security disability or SSI benefits or payments. *See Nolfi*, 2011 WL 3475852, at *3; HALLEX I-5-4-13.VIII.B.3. The parties appear to agree that the applicable

Development Period began on May 1, 1989 — 48 months before plaintiff filed his request to intervene in the *Stieberger* class action – and ended on August 31, 1998, the day before he became entitled to SSI benefits. (Tr. 413; *see also* Def. Mem. at 2-3 nn.2-3; Compl. at 6.)

After the case was remanded by the district court pursuant to *Stieberger*, plaintiff was to be given the opportunity to cross-examine Dr. Sharma, or Dr. Sharma's report would be excluded from consideration. (Tr. 244.) The Appeals Council then vacated the ALJ's decision on February 25, 1993, and remanded the case for further administrative proceedings consistent with the district court's order. (Tr. 239.)

On July 30, 1993, a new ALJ found plaintiff not disabled prior to the date last insured and through the date of decision. (Tr. 267-77.) Dr. Sharma did not appear at the hearing, so the ALJ did not consider his report. (Tr. 271.) The Appeals Council declined jurisdiction, and plaintiff challenged this round of decisions again in the district court. (Tr. 353). The district court remanded the case for further administrative proceedings, principally so that plaintiff could undergo a psychiatric consultative evaluation. (Tr. 345-47.) The Appeals Council

subsequently issued a remand order on May 22, 1996 for further proceedings consistent with the district court's order. (Tr. 352.)

After conducting a supplemental hearing, a third ALJ issued a decision on October 20, 1997, finding plaintiff not disabled. (Tr. 349-67.) The Appeals Council remanded the case for further administrative proceedings, explaining that the ALJ had not complied with its May 22, 1996 remand order because the order apparently did not contain the district court's instruction to obtain a psychiatric examination of plaintiff. (Tr. 377.) After a psychiatric consultative examination was performed, the same ALJ on January 25, 1999 again found plaintiff not disabled prior to his date last insured. (Tr. 417.) Plaintiff did not seek review of that decision.

On May 30, 2008 – nine years later – the Commissioner issued a reconsideration determination concerning plaintiff's October 26, 1984 and September 1, 1989 applications for SSI and disability insurance benefits, respectively. (Tr. 413-14.) The Commissioner, acting pursuant to a court order in the *Stieberger* suit, reviewed evidence in the Development Period and determined that the prior denials of plaintiff's applications had been in accordance with Second Circuit precedent. (Tr. 413.) Plaintiff requested a hearing before a fourth ALJ, who dismissed the request on the grounds that a *Stieberger* review had already been conducted by the third ALJ, and *res judicata* applied to that ALJ's January

25, 1999 decision. (Tr. 417.) The Appeals Council in July 2011 remanded the case for a new hearing, explaining that the Commissioner's May 30, 2008 *Stieberger* review decision was a new determination; consequently, *res judicata* did not apply for the Development Period (May 1, 1989 through August 31, 1998). (Tr. 425-26.)

A fifth ALJ subsequently considered plaintiff's October 26, 1984 and September 1, 1989 applications, and reviewed evidence in the record relating to the Development Period. (Tr. 311, 478.) Plaintiff was represented by counsel during this proceeding. (Tr. 311.) On December 30, 2011, this ALJ found plaintiff not disabled during the Development Period. (Tr. 319.) The Appeals Council denied plaintiff's request for review, rendering the ALJ's decision final. (Tr. 304-07.) Plaintiff subsequently commenced this action.

## II. **Factual Background**

### A. Plaintiff's History

Plaintiff was born in 1955. (Tr. 47.) From 1973 to 1984, he was employed as an emergency medical technician ("EMT").[2] (Tr. 116, 541.) Plaintiff testified in December 2011 that he also had worked part-time (about 25 hours per week) as a nursing home

---

[2] There are some inconsistencies in plaintiff's accounts of his work history. For example, he reported in a December 2011 hearing that he worked as an EMT from 1970 or 1971 until 1988 or 1989. (Tr. 478, 483; *see also* Tr. 232 (plaintiff's statement that he retired in 1985).)

orderly concurrently with his employment as an EMT. (Tr. 483-84.)
Plaintiff also testified that he worked for a few years in the
1980s as a minister, referred to himself as "Rev. John Johnson,"
and received — for a time, at least — a "stipend as [a] priest."
(Tr. 124, 488.) In the December 2011 ALJ hearing, plaintiff stated
that he worked as a minister between 1984 and about 1988. (Tr.
488.) In 1993, he testified that he had worked in 1986 as a
consultant at a homeless shelter. (Tr. 280, 298-99.) He earned a
G.E.D. in 1975. (Tr. 116, 391.)

In a disability report signed on August 10, 1989,
plaintiff stated that he stopped working as an EMT in February
1984 because of blackouts, vision problems, severe neck and back
pain, migraines, fainting spells, and dizziness. (Tr. 112.) He
also stated that he had been in five vehicular accidents (two while
working as an EMT) and had fallen down a flight of stairs while
carrying a patient. (Tr. 114, 117.) He wrote that his household
tasks included light walking, rehabilitative exercises, and
breathing exercises, and that his recreational activities included
reading the Bible, praying, and meditation. (Tr. 115.)

In a reconsideration disability report from March 1990,
plaintiff stated that he had been in a sixth motor vehicle accident
in August 1989. (Tr. 128.) He experienced "severe pain, blackouts,
migrain[es], [and] vision trouble." (*Id.*) It was painful for him
to walk, defecate, and engage in sexual intercourse. (Tr. 130.) In

August 1990, plaintiff reported that he still experienced severe pain, and could not bend or lift. (Tr. 134.) His condition had worsened, he wrote. (*Id.*)

Between December 1990 and February 1997, plaintiff reported taking Robaxin, Voltaren, Valium, Tylenol with codeine, Orudis, Motrin, Naprosyn, Trilisate, Toradol, Codeine, Flexeril, Claritin, and Prozac. (Tr. 214, 232, 252, 539.)

At a hearing held in January 1991, plaintiff stated that he lived with his wife and three minor children. (Tr. 47.) He explained that he stopped working because he had back and neck pain, problems getting around, and his eyes were "blacking out." (Tr. 48.) He saw a chiropractor and physical therapist, but medication was most effective in dealing with his pain. (Tr. 56.) He often used a back brace, had walked with a cane for the past year, and before that had used crutches for three years. (Tr. 49, 53.) His wife, he said, helped him dress and did all the household chores. (Tr. 50-51.) He went to church, but generally stayed home, watched the news, read the Bible, and helped his children with their homework. (Tr. 51.) He testified that his driver's license had been taken away because of the blackouts, and he did not take buses or subways. (Tr. 50, 56.) He stated that he could walk for five or 10 minutes, stand for 15 to 20 minutes, sit for 20 to 25

minutes, and carry five to 15 pounds. (Tr. 50.) A physician, he explained, told him not lift anything over 20 pounds. (Tr. 52.)

At an April 1992 hearing, plaintiff testified that his condition had worsened. (Tr. 66.) He explained that he could not walk or stand for as long a period of time and, although the pain medication he took helped, certain medications made him nauseous and dizzy. (Tr. 66-67, 71.) He stated that he was still not working, had stopped going to church, and experienced pain when he tried to move around. (Tr. 67, 70.) He felt suicidal at times and had been depressed for years since he stopped working. (Tr. 73-75.)

Plaintiff testified in a July 1993 hearing that he was homeless, but living with family and friends. (Tr. 280, 283.) He was receiving a pension of $380 per month since he retired as an EMT on disability in 1984. (Tr. 285.) Plaintiff said his back, neck, headaches, and vision problems prevented him from working. (Tr. 286.) At the hearing, he wore a cervical collar, and explained that he had stopped using a cane in the past few months. (*Id.*) The medications he took helped with the pain, but had side effects of nausea, vomiting, and drowsiness. (Tr. 287.) His vision problems prevented him from reading or watching television much, and he stated that he had constant headaches since 1984 as well as blackouts and migraine headaches. (Tr. 290-93.) His lower back pain had improved, he testified, but his eyes and the headaches

had worsened. (Tr. 297.) He remained depressed about not being able to take care of his wife and children. (Tr. 294-95, 298.)

At the December 2011 hearing, plaintiff stated that he eventually had to stop working because of the several accidents discussed above. (Tr. 484-89.) During the Development Period, he had seen orthopedists, chiropractors, and a neurologist, and had undergone physical therapy. (Tr. 485, 488.) He never had surgery. (Tr. 485.) The medications he took — muscle relaxers and pain killers — had side effects that made him feel ill. (Tr. 490.) Plaintiff said that he had returned to work after several of the accidents (Tr. 485-87), but he could not work after he retired on disability because he was experiencing constant blackouts. (Tr. 488-89.) He could not sit, stand, or walk (Tr. 489.) He also stated that he had post-traumatic stress disorder, and in 1989 and "some of the '90s" had seen psychiatrists, psychologists, and his minister. (Tr. 489-90.)

He had lived with his wife and children until about 10 years earlier. (Tr. 490.) He stated that he had gone back to work after 1998 because he had received integrative holistic medical treatment. (Tr. 491.) At the time of the hearing, he was receiving SSI of $173 per month in addition to his pension. (Tr. 492.)

B.  Medical Evidence During the *Stieberger* Development
    Period

    1.  *Treating Physicians*

        a.  Dr. Gayle Whittaker

Dr. Gayle A. Whittaker, D.C., a chiropractor, first treated plaintiff in March 1983. (Tr. 141.) Her earliest treatment of plaintiff in the *Stieberger* Development Period occurred in June 1989. (Tr. 141, 515.) In a report dated June 15, 1990, she discussed plaintiff's history and circumstances. (Tr. 137-46.) In 1989, plaintiff had complained of pain in the back of his head and neck, lower back pain radiating out into his arms and legs and left temple, blurry vision, ringing in his ears, headaches every other day, and muscle jerking and numbness in his arms and legs. (Tr. 141.) Dr. Whittaker referred to lumbar x-rays taken in 1983 and 1986 and a 1986 lumbar CT-scan as showing sacralization of L5, spina bifida of L5, rotation of L1-L4, and Schmorl's node at L4-L5. (Tr. 144.)

On examination, plaintiff had decreased left triceps and bicep reflexes. (Tr. 141.) His left thigh measured 1/2 inch longer than his right thigh, and his right calf was 1/4 inch longer than his left calf. (*Id.*) He had full ranges of motion in his cervical spine, with pain, but flexion of his lumbar spine was limited to 45 degrees (while the normal range of motion should be 90 degrees) with pain. (Tr. 143.) Dr. Whittaker determined that plaintiff

suffered from cervical subluxation complex, traumatic cervical disc syndrome, and traumatic lumbar disc syndrome. (Tr. 141.) Dr. Whittaker stated that plaintiff had been totally disabled throughout his treatment with her. (Tr. 144.)

In a disability evaluation from July 1989, Dr. Whittaker wrote that plaintiff had a total spinal impairment that was subject to flare-ups with or without work activity. (Tr. 148.) His severe back pain was relieved by medication, muscle relaxants, pain killers, chiropractic treatment, topical preparations, Ben-Gay, and tiger balm. (*Id.*) Plaintiff experienced severe pain when walking for more than one hour, lifting more than 20 pounds, repetitively lifting up to 15 pounds, and bending, stooping, squatting, or kneeling. (*Id.*) He had moderate pain when twisting and turning or standing for more than one hour (*id.*), and only slight pain if pushing or pulling up to 50 pounds, reaching overhead, reaching out, grasping or manipulating small objects, climbing a flight of stairs, or driving. (*Id.*) Dr. Whittaker also explained that plaintiff, while limited from doing heavy lifting, heavy work, and light work, could perform semi-sedentary work and sedentary work. (*Id.*)

In a form submitted for plaintiff's worker's compensation claim dated May 23, 1990, Dr. Whittaker stated that plaintiff had not been treated since August 1989. (Tr. 147.) Spinal

manipulation was required only on a symptomatic basis, she wrote, adding that plaintiff was permanently partially disabled. (*Id.*)

In January 1991, Dr. Whittaker reported that plaintiff's chiropractic treatment in her office had consisted of spinal manipulation from March to December 1983, February to November 1987, and June 1988 to August 1989. (Tr. 218.) She explained that "[t]he patient's condition has changed little during this time," and that plaintiff was "totally and permanently disabled." (*Id.*)

In a September 1991 letter, Dr. Whittaker stated that plaintiff had received chiropractic treatment three times in January 1991, after an August 1989 automobile accident. (Tr. 220.) Dr. Whittaker wrote that plaintiff had been totally disabled at that time. (*Id.*)

About six years later, after a February 1997 auto accident, plaintiff returned to Dr. Whittaker for chiropractic treatment. (Tr. 321, 330.) He complained of pain in the neck, shoulder, arm and hand, mid-back, lower back, hip, and leg. (Tr. 324.) Dr. Whittaker determined that his cervical and lumbar ranges of motion were restricted. (*Id.*) He was experiencing muscle spasms in his cervical, thoracic, and lumbar vertebrae. (*Id.*) There was also a loss of strength in plaintiff's right hand, and his reflexes were diminished in the triceps, biceps, Achilles, and wrist. (*Id.*)

Dr. Whittaker diagnosed cervical brachial neuralgia, thoracic sprain/strain, sciatica, headache, and cervical,

thoracic, and lumbar subluxation. (Tr. 326.) She stated that in an eight-hour day, plaintiff could sit for three hours, stand/walk for two hours, frequently lift up to five pounds, occasionally lift and carry up to 20 pounds, and occasionally bend, climb steps, and reach. (Tr. 327.) He could deal with low levels of stress. (Tr. 328.) Dr. Whittaker stated that plaintiff had been totally disabled since 1983, and unable to return to his former work duties or perform full-time work. (Tr. 321, 326.)

In a March 1997 letter, Dr. Whittaker reiterated that plaintiff "continues to be totally disabled and unable to return to his former work duties." (Tr. 321.) In an August 1998 letter, Dr. Whittaker recited plaintiff's history and stated that he had been classified by Workers' Compensation as permanently disabled based on a February 1984 work accident. (Tr. 380.)

   b.   Dr. Subbaraju Polepalli (Staten Island Medical Group HIP)

Plaintiff had a routine check-up with Dr. Subbaraju Polepalli, M.D., in July 1989 and saw the doctor again for temporary minor issues sporadically in 1989 and early 1990 (Tr. 195-96, 565, 575.) On August 22, 1990, plaintiff reported to Dr. Polepalli that he felt well and was attending "pre-med" in St. Lucia. (Tr. 237.) On December 24, 1990, plaintiff told Dr. Polepalli that he was a medical student in Jamaica and had returned for the holidays. (Tr. 238.) Plaintiff complained of lower back

pain, and the doctor diagnosed a history of discogenic disease. (*Id.*) Dr. Polepalli stated in February 1992 that plaintiff had been seen in his office by other physicians in January and February 1992. (Tr. 233.) That doctor prescribed Butalbital and referred plaintiff for physical therapy due to a history of discogenic disorder. (Tr. 224, 570.) In January 1992 Dr. Polepalli prescribed Orudis and Tylenol #3 and in February 1992 another doctor in Dr. Polepalli's office referred plaintiff for physical therapy. (Tr. 225-26, 233.)

Dr. Polepalli wrote a letter in October 1996 describing neck and back pain plaintiff was suffering as a result of a fall on ice in January 1996. (Tr. 329.) Dr. Polepalli stated that plaintiff had been seen by various doctors in his office eight times throughout 1996. (*Id.*) In an April 1997 letter, Dr. Polepalli stated that plaintiff had been disabled and unable to work since February 1984. (Tr. 323.) In an August 1998 letter, Dr. Polepalli stated that plaintiff had been seen by a variety of doctors at his office 11 times throughout 1997 and 1998. (Tr. 382.)

A Staten Island Medical Group HIP administrator wrote letters in September 1992 and June 1993 indicating that plaintiff had been seen at her office and treated for complaints of lower back pain with multiple internists, orthopedists, and a neurologist in her group between 1982 and 1993. (Tr. 249-51.)

Another Staten Island Medical Group HIP doctor, Dr. M. Bunag, M.D., completed a form on March 30, 1997 stating that plaintiff had been unable to work since March 30, 1985 but would be able to return to work on April 2, 1998.[3] (Tr. 386.) Dr. Bunag wrote that plaintiff was totally and permanently disabled due to a back injury. (*Id.*) He diagnosed chronic cervical and lumbar syndrome beginning in 1987. (*Id.*)

In a note dated July 13, 1998, and addressed to the Brooklyn Union Gas Company, Dr. J. Hayles, M.D., of the Staten Island Medical Group HIP stated that plaintiff had been seen that day and could return to work on July 15, 1998. (Tr. 379.)

### 2. Consulting Physicians

#### a. Dr. Bruce Reitberg

In December 1989, Dr. Bruce Matthew Reitberg, M.D., performed an orthopedic consultative examination on plaintiff. (Tr. 173-76.) Plaintiff recited his accident and work history, and complained of headaches, blurry vision, non-radiating neck pain, and low back pain that radiated to his right lower extremity. (Tr. 174.) Dr. Reitberg stated that plaintiff's "general health is good." (*Id.*) He wore a cervical collar, a lumbosacral corset, and

---

[3] Defendant suggests that the years on the form were filled in with a different handwriting than was used on the month and day. (*See* Def. Mem. at 22 nn. 11-12.) Defendant proposes that Dr. Bunag likely intended to write that the date of disability was March 30, 1997 (the date he observed plaintiff) and to write the date he could return to work as April 2, 1997, three days after the form was allegedly completed. (*See id.*) Plaintiff did not address this issue in his briefing.

used a cane. (*Id.*) During the examination, plaintiff was alert and fully oriented, and there was "normal sensation about the face and neck." (*Id.*) As to plaintiff's neck, there was a slight restriction of range of motion, and tenderness, mild spasm, and complaints of pain. (*Id.*) A neurological examination revealed "decreased sensation on the dosum of the left forearm and the left lateral thigh and left lateral calf." (*Id.*)

Dr. Reitberg opined that plaintiff had "post concussion syndrome." (Tr. 176.) He saw evidence of a herniated intervertebral discus with evidence of right sciatica, and observed "diminished sensation, diminished strength, atrophy, positive sciatic tension tests, and sensory changes." (*Id.*) He stated that plaintiff was "totally and permanently disabled." (*Id.*) Dr. Reitberg stated that plaintiff could not sit for longer than 40 minutes or stand for longer than 20 minutes; he could walk approximately four to five blocks; and he could not lift more than five pounds on an occasional basis. (*Id.*)

b.    Dr. Joseph Fulco

Dr. Joseph Fulco, M.D., consultatively examined plaintiff on January 3, 1990. (Tr. 177-79.) Plaintiff reported some improvement from visiting a chiropractor two to three times per week since last seeing Dr. Fulco in 1987. (Tr. 177.) Plaintiff told Dr. Fulco that a recent CT-scan had shown a herniated disc in his neck and lower back. (*Id.*) Plaintiff complained of constant

pain in his neck, which increased on any movement. (*Id.*) He had constant, severe pain in his lower back which radiated into both legs. (Tr. 178.) Plaintiff reported that he used a cane in his right hand at all times, and was able to walk about half of a block before stopping. (*Id.*) He told Dr. Fulco that he spent time at home, but occasionally took short drives, and rarely cooked and shopped. (*Id.*)

Dr. Fulco examined plaintiff, and noted that he walked slowly with a limp of the right leg. (*Id.*) He did not attempt to walk on his heels and toes due to pain. (*Id.*) He rose from a chair slowly. (*Id.*) An examination of the spine showed cervical rotation of 45 degrees in either direction, and flexion and extension were decreased by about 20 degrees each. (*Id.*) Plaintiff complained of "pain at the extremes of all these motions." (*Id.*) Plaintiff complained of lower back pain in the sitting position. (*Id.*) He exhibited full ranges of motion in the shoulders, elbows, and wrists. (*Id.*) Motor strength, Dr. Fulco reported, was about 4/5, there was no evidence of atrophy, there was no sensory loss, and all reflexes were normal. (*Id.*) Plaintiff also had full range of motion of the hips, knees, and ankles. (Tr. 179.) Dr. Fulco diagnosed a herniated intervertebral disc of lumbosacral spine and a herniated disc of cervical spine by history. (*Id.*) Dr. Fulco

noted on the report that plaintiff refused x-rays, but gave no further explanation. (*Id.*)

       c.   Dr. C. Sharma

Plaintiff was consultatively examined by neurologist C. Sharma, M.D., on June 23, 1990. (Tr. 183-86.) Plaintiff reported pain in his neck, low back, right leg, and left knee. (Tr. 183.) He said he had been using a cane for three years, and was taking Robaxin and Motrin. (*Id.*) Dr. Sharma reported that plaintiff's memory, calculations, and language were intact. (*Id.*) His vision, facial, gag, palatal, and tongue movements, as well as his sensation and motor strength, were normal. (*Id.*) Dr. Sharma pointed out that plaintiff walked with a cane, but opined that he did not require it. (*Id.*) Dr. Sharma noted that plaintiff limped, but suggested that his gait was "related to pain and is not a neurological gait." (*Id.*) Dr. Sharma stated that plaintiff had no neurological deficit, and diagnosed "[m]ultiple pain syndrome." (Tr. 184.) Dr. Sharma also determined that plaintiff had no restrictions in walking, handling objects, bending, pushing and/or pulling, seeing, hearing, speaking, sitting, lifting, carrying, or standing. (Tr. 185-86.) The doctor would not give a range of restrictions based solely on plaintiff's subjective pain. (Tr. 185.)

d.    Dr. Bernard Goldberg

Ophthalmologist Dr. Bernard Goldberg, M.D., performed a consultative examination on July 5, 1990. (Tr. 180-82.) Plaintiff reported that his eye ached and that he saw floating spots. (Tr. 180.) Plaintiff had uncorrected visual acuity of 20/60 in the right eye, and 20/200 in the left eye. (*Id.*) Refraction showed hi-myopia in both eyes with astigmatism, with corrected visual acuity of 20/40+ in each eye for distance. (*Id.*) (20/20 is considered normal; 20/200 is often considered legally blind. *See E.E.O.C. v. United Parcel Serv., Inc.*, 306 F.3d 794, 798 (9th Cir.) *opinion amended on denial of reh'g*, 311 F.3d 1132 (9th Cir. 2002).) Plaintiff's pupils were normal and reacted promptly to light and ocular pressure. (Tr. 180.) Dr. Goldberg diagnosed hi-myopia with astigmatism, multiple head injuries, and cerebral concussion, and recommended that plaintiff undergo a neurologic evaluation. (Tr. 180-81.)

e.    Dr. L. Travis

Neurologist Dr. L. Travis, M.D., conducted a consultative examination on plaintiff in February 1992. (Tr. 227-28.) Plaintiff complained of pain while defecating and when walking or bending, and pain in both legs. (Tr. 227.) He reported that he felt "weak all over, [and] gets dizzy spells, blurred vision and constant headaches." (*Id.*) During a physical examination, Dr. Travis observed that his memory and language were normal, his

vision was intact, and his hearing was normal. (*Id.*) Dr. Travis reported that plaintiff's restriction in neck and lumbar spine movement was "voluntary." (*Id.*) He had "no trouble bending over to put on his shoes" or "getting on and off the exam table." (*Id.*) Dr. Travis wrote that plaintiff's "gait was very slow and somewhat bizarre. At times one leg was favored and at other times the other leg was favored. [Dr. Travis] could not detect any organic disturbance to his gait." (*Id.*) Dr. Travis ordered an x-ray, but plaintiff refused. (Tr. 228.)

During his examination, Dr. Travis found that plaintiff had no trouble sitting. (Tr. 229.) He could lift up to 15 pounds, carry up to 25 pounds, stand up to 15 minutes before becoming dizzy, walk up to one block, push or pull up to 25 pounds, and could see, hear, and speak normally. (Tr. 230.) In addition, Dr. Travis wrote that plaintiff had no trouble bending or handling objects. (*Id.*)

> f.   Dr. Robert Goldstein

Psychiatrist Dr. Robert Goldstein, M.D., consultatively examined plaintiff in January 1996. (Tr. 533-37.) Plaintiff reported that he had not worked since 1984, and that he had become socially withdrawn. (Tr. 534.) At the time of the examination, plaintiff was living with friends because he was unable to maintain his own residence. (*Id.*) Because of his chronic back pain and depression, plaintiff was unable to shop, cook, or clean. (*Id.*) He

said he had received psychiatric counseling some years earlier in conjunction with orthopedic treatment for his back problems and other pain. (Tr. 534-35.) Plaintiff told Dr. Goldstein that he had frequent migraines of moderate severity and visual problems that limited his ability to read or watch television. (Tr. 535.) At the time of the examination, he was taking "Motrin, a codeine-containing analgesic, and Valium." (*Id.*)

Dr. Goldstein also evaluated plaintiff's mental state. (Tr. 535-36.) He observed that plaintiff appeared depressed and walked with some difficulty. (Tr. 535.) His anxiety level was high, Dr. Goldstein wrote, and his sleep was fitful. (*Id.*) In addition, his weight had fluctuated. (*Id.*) Although he had not attempted to hurt himself, he had "passive suicidal ideation." (*Id.*) He felt "guilty and worthless, because he [could not] function or support his loved ones." (*Id.*) He was forgetful and had short-term memory problems secondary to depression, Dr. Goldstein reported. (*Id.*)

Dr. Goldstein concluded that plaintiff suffered from dysthymic disorder, a "serious psychiatric condition." (Tr. 536.) This is a "chronic mood disorder or mental depression" that was chronic and progressively deteriorating; in addition, it was very likely permanent and irreversible. (*Id.*) Dr. Goldstein wrote that plaintiff had been totally disabled since the mid-1980s and could

not "work in any capacity as a result of his disabling condition."
(*Id.*)

       g.    Dr. Jung Hahn[4]

      Psychiatrist Dr. Jung Hahn, M.D., consultatively examined plaintiff in October 1998, shortly after the end of the relevant *Stieberger* Development Period (August 31, 1998).[5] (Tr. 390-92.) Plainitff stated that he was homeless, and had no money or place to stay. (Tr. 390.) He stated that he was sick and tired, and cried frequently. (*Id.*) He also stated that he would sometimes drink alcohol, which helped him sleep. (Tr. 391) He complained of headaches, back and neck pain, and generalized muscle aches, and said he could not work because of his physical problems. (Tr. 390-91.) Dr. Hahn wrote that plaintiff was cooperative, and his speech was coherent. (Tr. 391.) Plaintiff denied experiencing delusions, but he felt that people were following him and listening to him when he used public telephones. (Tr. 392.) He denied active suicidal thoughts. (*Id.*) His recent and remote memory, Dr. Hahn noted, were good and his intellectual functioning appeared

---

[4] The ALJ mistakenly referred to Dr. Hahn as "Dr. Slowe." (Tr. 317-18.)

[5] Although Dr. Hahn examined plaintiff after the expiration of the Development Period, his report is still valuable to the extent it can be used to evaluate plaintiff's alleged disability during the Development Period. *See Peralta v. Barnhart*, No. 04-CV-4557, 2005 WL 1527669, at *13 (E.D.N.Y. June 22, 2005) ("Thus, although the report is dated after the ALJ's decision, the ALJ may still properly consider it to the extent it sheds light on [the claimant's] disability during the relevant period." (citing *Lisa v. Sec'y of Dep't of Health & Human Servs.*, 940 F.2d 40, 44 (2d Cir. 1991))).

average. (*Id.*) His attention span and concentration were normal, as were his insight and judgment. (*Id.*)

Dr. Hahn did not make any mental diagnoses, but assessed generalized muscle aches. (*Id.*) He stated that plaintiff was capable of caring for his activities and personal needs, and that his socialization and interests were limited. (*Id.*) Dr. Hahn determined that plaintiff was able to perform work-related activities, including simple manual work. (*Id.*)

### 3. Other Evidence

#### a. Residual Functional Capacity Assessments

State agency medical consultant Dr. F. Randall, M.D., stated in a March 1990 form that plaintiff had no exertional limitations. (Tr. 83-91.) Dr. Randall wrote that plaintiff could frequently climb, balance, stoop, and kneel, and he could occasionally crouch and crawl. (Tr. 86.)

In July 1990, state agency medical consultant Dr. H. Shapiro, M.D., found that plaintiff could occasionally lift and/or carry up to 50 pounds and frequently lift and/or carry up to 25 pounds. (Tr. 97.) He could stand and/or walk as well as sit with normal breaks for about six hours in an eight-hour workday. (*Id.*) He could push and pull without limitations. (*Id.*) In addition, he could occasionally climb and balance, but could never stoop, kneel, crouch, or crawl. (Tr. 98.) He had no manipulative, communicative, or environmental limitations. (Tr. 99-100.) With respect to

plaintiff's vision, Dr. Shapiro stated that his far acuity, depth perception, accommodation, and color vision were unlimited, but his near acuity and field of vision had some limitations. (Tr. 99.)

b. Vocational Expert

Vocational expert ("VE") Edna F. Clark testified at plaintiff's hearing on December 5, 2011. (Tr. 476, 493-99.) The VE classified plaintiff's past relevant work as an EMT as medium skilled work and his work as an orderly as heavy, semi-skilled work. (Tr. 494.) The ALJ posed a hypothetical individual of plaintiff's age, education, and work experience, who could lift up to 20 pounds occasionally, lift or carry up to 10 pounds frequently, stand or walk for approximately six hours in an eight-work workday, and sit for approximately six hours in an eight-hour workday with normal breaks. (Tr. 494-95.) The individual could occasionally climb, balance, stoop, kneel, crouch, and crawl, and had no manipulative, environmental, visual, or communicative limitations. (Tr. 495.) The work would be in a low-stress job with only occasional decision-making required. (*Id.*)

The VE explained that such an individual could not perform plaintiff's past relevant work as an EMT or orderly, but could perform a number of light, unskilled jobs including cafeteria attendant (with 90,000 jobs nationally and 8,200 jobs locally), small parts assembler (with 27,000 jobs nationally and 5,000 jobs

locally), and cashier (with 300,000 jobs nationally and 9,000 jobs locally). (Tr. 495-96.)

The ALJ then added requirements to the hypothetical: the work would be limited to simple routine repetitive tasks, there would only be occasional interaction with the public, and there would be a sit/stand option that would allow the person to sit or stand alternatively at will provided they were not off task more than 10 percent of the work period. (Tr. 496.) The VE testified that the hypothetical individual could perform unskilled sedentary work as a surveillance systems monitor (with 34,000 jobs nationally and 1,900 locally) or a callout operator (with 7,000 jobs nationally and 1,100 locally). (Tr. 497.) The VE explained that the individual could also perform work as an "entry-level clerical worker." (*Id.*)

## DISCUSSION

Plaintiff essentially presents five arguments in favor of remand. First, he argues that the vocational expert lacked a basis for her testimony about employment numbers during the Development Period. (Pl. Mot. at 4.) Second, he argues that a consulting psychiatrist failed to provide a list of medical records that he reviewed when drafting his report. (*Id.*) Third, he states that the ALJ inappropriately discounted his psychiatric condition. (*Id.* at 4-5) Fourth, he argues that the ALJ improperly considered a neurologist's report that should have been excluded. (*Id.* at 5.)

Finally, he contends that the ALJ's decision to give no weight to his treating chiropractor's opinion warrants remand.[6] (*Id.*) The court will consider these arguments in turn.

## I. **Applicable Legal Standards**

### A. Standard of Review

In reviewing the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c)(3), a district court reviews the administrative transcript to "determine whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citation omitted). Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Halloran v. Barnhart,* 362 F.3d 28, 31 (2d Cir. 2004).

An evaluation of the "substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citation omitted). The reviewing court may not "substitute its own judgment for that of the Secretary, even if it might justifiably have reached a different result upon a de novo review."

---

[6] Though plaintiff is represented by an attorney in this suit, he does not cite to the record or to any case law directly supporting his arguments. (Pl. Mot. at 4-5.)

*Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (internal quotation marks and citation omitted).

B.    The Commissioner's Five-Step Analysis of Disability
        Claims

A claimant is disabled under the Act when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be of "such severity" that the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work [that] exists in the national economy . . . ." *Id.* § 423(d)(2)(A).

The Commissioner uses a "five-step sequential evaluation" to determine whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(1); *see also Perez v. Chater*, 77 F.3d 41, 46 (2d. Cir. 1996) (describing five-step process). Under this process,

> if the Commissioner determines (1) that the claimant is
> not working, (2) that he has a 'severe impairment,' (3)
> that the impairment is not one [listed in Appendix 1 of
> the    regulations]    that    conclusively    requires    a
> determination of disability, and (4) that the claimant
> is not capable of continuing in his prior type of work,
> the Commissioner must find him disabled if (5) there is
> not another type of work the claimant can do.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)
(internal quotation marks and citation omitted).

"The claimant has the general burden of proving that he
or she has a disability within the meaning of the Act." *Burgess v.
Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). The claimant "bears the
burden of proving his or her case at steps one through four." *Id.*
(internal quotation marks and citation omitted). At step five,
however, if the claimant cannot perform her past work, "the burden
shifts to the Commissioner to show that in light of the claimant's
[residual functional capacity], age, education, and work
experience, the claimant 'is able to engage in gainful employment
within the national economy.'" *Marchetti v. Colvin*, No. 13-CV-
02581, 2014 WL 7359158, at *10 (E.D.N.Y. Dec. 24, 2014) (citing
*Sobolewski v. Apfel*, 985 F. Supp. 300, 310 (E.D.N.Y. 1997)).

## II.  **Application**

### A.  The ALJ's Decision

After reviewing this evidence, the ALJ in this case
issued the decision under review on December 30, 2011. (Tr. 319.)
The ALJ first concluded that plaintiff had not engaged in
substantial gainful activity since May 1, 1989. (Tr. 313.) At the
second step, the ALJ determined that during the Development Period
plaintiff had the severe impairments of cervical and lumbar
degenerative disc disease and post-traumatic stress disorder.
(*Id.*) At the third step, the ALJ concluded that plaintiff's

impairments did not meet or medically equal a listed impairment. (Tr. 313-14.) At the fourth step, the ALJ determined plaintiff's residual functional capacity, evaluating both his physical and mental limitations. (Tr. 314-17.)

Despite his impairments, the ALJ concluded that plaintiff could perform light work. (Tr. 314.) He could lift up to 20 pounds occasionally and 10 pounds frequently; stand and/or walk up to six hours in an eight-hour workday; sit for approximately six hours in an eight-hour workday with normal breaks; occasionally climb, balance, kneel, stoop, crouch, or crawl. (*Id.*) Plaintiff had no manipulative, environmental, visual or communicative limitations, the ALJ determined, but he was limited to a low-stress job with only occasional decision-making, changes in the work environment, and interaction with the public. (*Id.*) Based on this assessment and the testimony of the vocational expert, the ALJ found at step four that plaintiff could not perform his past relevant work as an EMT or orderly. (Tr. 317.)

However, at step five the ALJ concluded that plaintiff could perform other light work that existed in significant numbers in the national economy. (Tr. 317-18.) After reviewing plaintiff's personal and medical history, the ALJ concluded that plaintiff's post-traumatic stress disorder was not disabling. (Tr. 315-17.) The ALJ credited Dr. Travis's observation that plaintiff had a normal neurological examination and Dr. Hahn's opinion that

plaintiff could perform simple manual work, and gave little weight to Dr. Goldstein's opinion that plaintiff was disabled due to dysthymic disorder. (Tr. 317.) The ALJ also relied on plaintiff's "minimal to non-existent psychiatric treatment" prior to his date last insured, and the absence in his medical record of psychotropic medication. (Tr. 315-16.)

In evaluating plaintiff's cervical and lumbar degenerative disc disease, the ALJ noted that plaintiff was only 35 years old at the time of his date last insured. (Tr. 316.) He pointed to Dr. Reitberg's opinion that plaintiff had only moderate neck and back problems, Dr. Travis's opinion that plaintiff had a "normal neurological examination," the absence of any surgical history, no psychiatric hospitalizations, and a one-day hospitalization following a 1989 motor vehicle accident. (Tr. 315-16.) The ALJ did not find plaintiff fully credible because his testimony was contradicted by medical evidence in the file, including CT scans performed in 1986. (Tr. 316.)

The ALJ accorded no weight to treating chiropractor Dr. Whittaker because her findings were inconsistent with medical evidence in the file and sometimes with her own findings, and because she was not an "acceptable medical source" within the meaning of 20 C.F.R. § 404.1513(d) and 20 C.F.R. § 416.913(d). (Tr. 316-17.) The ALJ similarly stated that Dr. Polepalli's statement about plaintiff's disability was not supported by the

medical record. (Tr. 317.) The ALJ therefore found plaintiff not

disabled during the Development Period.[7] (Tr. 31.)

B.  <u>The Vocational Expert's Testimony About Employment
    Numbers During the *Stieberger* Development Period Was
    Grounded in Evidence</u>

Plaintiff first argues that the vocational expert did

not provide any basis for her opinion that the jobs she described

existed during plaintiff's *Stieberger* Development Period (May 1,

1989 through August 31, 1998). (*See* Pl. Mot at 4.)

Plaintiff contends that "the Administrative Law Judge

did not inquire as to the basis for the vocational expert's opinion

that such jobs existed in the numbers provided so many years ago."

(Pl. Mot. at 4.) Plaintiff appears to argue both that the VE

misunderstood the relevant time period and that, even if she did

understand, she failed to adequately support her opinion.

Defendant responds first by noting that plaintiff, although he had

counsel before both the ALJ and the Appeals Council, never objected

to the VE's testimony. (Def. Reply at 7.) Defendant also contends

that the VE did in fact testify about jobs numbers pertaining to

---

[7] At the time of the ALJ's decision in this case, plaintiff was receiving SSI
benefits. (Tr. 478.) In his decision, the ALJ appears to have mistakenly stated
that plaintiff was not entitled to SSI through the date of the ALJ's decision
rather than through the end of the *Stieberger* Development Period. (Tr. 319.)
However, there is no evidence in the record that plaintiff's SSI benefits were
ever terminated, Defendant stated that plaintiff's SSI benefits were never
terminated, and plaintiff did not dispute this statement in his cross-motion.
(Def. Mem. at 6 n.8.) Accordingly, the court will not address plaintiff's
arguments concerning a "purported SSI cessation." (Pl. Mot. at 4.)

the Development Period and that she explicitly stated the source of her figures. (*Id.* at 8.)

During her testimony, the ALJ did not explicitly ask the vocational expert whether her opinions about the plaintiff's employment possibilities referred to the Development Period. However, it is clear from the hearing transcript that the vocational expert recognized that the relevant window for purposes of her testimony was the Development Period.

First, the VE testified that she relied on the "Dictionary of Occupational Titles" in forming her opinions about employment possibilities in this case. (Tr. 499.) This publication, which was printed by the U.S. Department of Labor, was last updated in 1991. *See* United States Department of Labor, *Dictionary of Occupational Titles* (4th ed., rev. 1991), http://www.oalj.dol.gov ("The Dictionary of Occupational Titles (DOT) was created by the Employment and Training Administration, and was last updated in 1991."); *see also Winkler v. Comm'r, Soc. Sec. Admin.*, No. CIV. 14-2720, 2015 WL 4069334, at *4 n.3 (D. Md. July 2, 2015) ("The VE relied on the Dictionary of Occupational Titles ('DOT'), a document published by the United States Department of Labor and last updated in 1991."); *Downes v. J.P. Morgan Chase & Co.*, No. 03 CIV. 8991, 2007 WL 1468218, at *11 n.10 (S.D.N.Y. May 16, 2007) ("[T]he DOL's Dictionary of Occupational Titles ("DOT") was last updated in 1991 . . . ."). If the data on

which the VE relied came from 1991, which was well within the Development Period, it is highly unlikely that the VE misunderstood the relevant window of time in this case. Her reliance on this source also demonstrates that her testimony was well-founded.

Second, the VE specifically stated that she had been listening throughout the short hearing (the transcript is just over 20 pages (Tr. 478-500)), during which the ALJ stated that "the period we're looking at that [I'm] probably most interested in is during the 1980s and 1990s." (Tr. 482, 492.) Finally, the VE also asked the claimant questions about the time period in question. (Tr. 492-93.) Consequently, plaintiff's argument that the VE misunderstood the relevant time period or did not have an adequate source for her figures is unfounded.

C.    The Consulting Psychiatrist's Failure to Provide a List of Medical Records He Reviewed Does Not Warrant Remand

Plaintiff next argues that the ALJ failed to list the documents provided to psychiatrist Dr. Jung Hahn at the time of his consultative examination. (Pl. Mot. at 4.) Defendant responds that no statute, regulation, or decision compels such a disclosure and that even if the ALJ did err by failing to provide such a list, plaintiff does not argue that any prejudice resulted. (Def. Reply at 2-4.)[8]

---

[8] Plaintiff argues relatedly that the ALJ mistakenly referred to Dr. Hahn as Dr. Slowe. (Pl. Mot. at 4.) Although the ALJ did in fact repeatedly make this mistake, the most likely explanation is that Dr. Hahn submitted his report to Dr. I. Arnold Slowe, M.D., the chief medical consultant at the Division of

The ALJ did rely repeatedly on Dr. Hahn's consultative examination, performed in October 1998 (*see* Tr. 390-92), to support his conclusion that plaintiff's alleged post-traumatic stress disorder was not disabling during the Development Period. (Tr. 315-17.) Pursuant to 20 C.F.R. § 404.1513 and 20 C.F.R. § 416.913, the ALJ accorded Dr. Hahn's opinion "great weight . . . since it [was] supported by a record showing that by the mid-to-late 1990s the claimant's minimal spinal functional limitations had improved and his objective mental testing has always been normal." (Tr. 317.) Neither the ALJ's decision nor Dr. Hahn's report indicates the documentation with which Dr. Hahn was provided at the time of his consultation.

However, plaintiff cites no statute, regulation, or case (in this circuit or another) requiring such enumeration and the court has not been able to locate one. The regulations provide that a comprehensive consultative report should include the plaintiff's primary complaints, a description of the history of

---

Disability Determinations. (Tr. 315-17, 390.) This probable typo had no substantive impact on the ALJ's analysis, and certainly does not call for a remand. *See Johnson v. Colvin*, No. 13-CV-1455, 2014 WL 3809106, at *5 (D. Colo. Aug. 1, 2014) ("[The] fact that the ALJ used the wrong name to refer to [a consulting physician] does not require remand."); *Davis v. Astrue*, No. CIV. A. H-10-4770, 2012 WL 9392188, at *4 n.72 (S.D. Tex. Feb. 3, 2012) ("Nevertheless, any error by the ALJ in referring to the doctor by the wrong name is harmless because the error, if any, does not affect the substance of the report upon which the ALJ relied . . . ."), *adopted by Davis v. Astrue*, No. CIV. A. H-10-4770 (S.D. Tex. Feb. 21, 2012), ECF No. 11.

those complaints, examination findings, the results of laboratory or other tests, a diagnosis and prognosis, and a statement about the individual's abilities despite his impairments. *See* 20 C.F.R. § 404.1519n(c); 20 C.F.R. § 416.919n. Dr. Hahn complied with these requirements. (*See* Tr. 390-92.)

On the other hand, although plaintiff fails to cite to *any* applicable law in support of his position on this issue, the court recognizes that the regulations do require that a consulting physician be provided with "any necessary background information about [a claimant's] condition." 20 C.F.R. § 416.917; *see also* 20 C.F.R. § 404.1517. But this language does not amount to a requirement that every consulting physician be provided with all of a claimant's medical records and history (much less a requirement that the physician *report* that she viewed every, or any, document in the record). *See Genovese v. Astrue*, No. 11-CV-02054, 2012 WL 4960355, at *18 (E.D.N.Y. Oct. 17, 2012) ("The SSA's statement that an examiner must be given 'necessary background information about [a claimant's] condition,' 20 C.F.R. §§ 404.1517, 416.917, does not mandate that 'the examiner must be provided with plaintiff's medical records,' as plaintiff asserts it does.").[9]

_____

[9] Some district courts outside of this circuit have effectively held that consulting physicians must be provided with all of a claimant's medical records. *See Mateer v. Bowen*, 702 F. Supp. 220, 222 (S.D. Iowa 1988) ("Furthermore, the court would indicate to the Secretary that it should always provide all medical records to any physician from whom he solicits an opinion regarding any social

Although there is no indication in Dr. Hahn's report that he was provided background medical information about plaintiff, there is similarly no indication that he was not. Without any evidence that Dr. Hahn lacked adequate medical background on plaintiff and nothing but a single unsupported sentence in plaintiff's brief addressing this issue, the court will not remand on this ground.

D. The ALJ's Conclusion that Plaintiff's Mental Health Issues Were Not Disabling Was Supported By Substantial Evidence

Plaintiff next argues that the ALJ relied upon his own "unqualified psychiatric opinion that Dysthmia cannot be a disabling condition." (Pl. Mot. at 4.) He contends that this conclusion is undermined by psychiatrist Dr. Goldstein's report and by the recently updated Diagnostic and Statistical Manual of Mental Disorders, which replaced dysthymia with "persistent depressive disorder." (*Id.*; *see also Diagnostic and Statistical Manual of Mental Disorders* 169-70 (5th ed. 2013) ("*DSM*").)

Defendant responds that the ALJ considered evidence of plaintiff's mental health issues, but appropriately accorded Dr. Goldstein's report little weight. (Def. Reply at 3-5.) Defendant also notes that multiple other consulting physicians failed to

_____

security case."); *see also Pruitt v. Astrue*, No. EDCV 08-1107, 2010 WL 1330164, at *5 (C.D. Cal. Mar. 31, 2010). But the language of the relevant regulation does not extend so far. "Necessary background information," 20 C.F.R. § 416.917; 20 C.F.R. § 404.1517, plainly does not specify "all medical records."

diagnose serious mental health problems and that plaintiff's own history undermines his theory that his dysthymia was disabling. (*Id.* at 4-5.)

The ALJ concluded that plaintiff suffered from post-traumatic stress disorder, a severe impairment. (Tr. 313; *see also* 20 C.F.R. § 404.1520(c); 20 C.F.R. § 416.920(c).) The ALJ, however, determined that this would not preclude him from working. (Tr. 314-17.) The ALJ relied upon Dr. Travis's observation that plaintiff's neurological functioning was normal and Dr. Hahn's opinion that plaintiff could perform simple manual work, giving both consulting physicians' opinions "great weight." (Tr. 317.) In addition, the ALJ cited Dr. Sharma's finding that plaintiff had a "normal mental status." (Tr. 315.) The ALJ also determined that plaintiff had not taken "psychological-related medication"[10] or experienced any psychiatric hospitalizations, and received minimal to no psychiatric treatment. (Tr. 315-16.)

The ALJ did address Dr. Goldstein's consultative psychiatric report. (Tr. 317.) In that report, Dr. Goldstein stated that plaintiff was unable to work due to dysthymic disorder. (Tr. 533-37.) But the ALJ gave Dr. Goldstein's opinion "little weight" because the report appeared to be rooted principally in subjective

---

[10] The record reveals, however, that plaintiff — at least according to his own written statements about his medical history — at one time was prescribed Prozac. (Tr. 539; *United States v. Sasso*, 59 F.3d 341, 347 (2d Cir. 1995) (recognizing that Prozac is an antidepressant).)

complaints rather than objective evidence. (Tr. 317.) The ALJ explained that Dr. Goldstein did not have a treating relationship with the claimant, and stated that "dysthymia is not a disabling condition, but by its very nature is considered a low-level form of depression." (*Id.*)

The court concludes that the ALJ's decision with respect to plaintiff's alleged post-traumatic stress disorder was supported by substantial evidence. As an initial matter, the only diagnosis of dysthymia came from Dr. Goldstein. It was reasonable for the ALJ to grant little weight to the opinion of a single physician who apparently met with plaintiff only a single time and who provided a diagnosis distinct from that of the many other physicians (both treating and consulting) who met with plaintiff during the Development Period. (Tr. 533)

In addition, even recognizing that there was some evidence of mental health issues besides Dr. Goldstein's report (*see* Tr. 73-75, 294-95, 298 (plaintiff's testimony about his depression); Tr. 539 (plaintiff's statement that he took Prozac in 1995)), there was substantial evidence in the record supporting the ALJ's conclusion. Neurologist Dr. Travis's mental status examination in February 1992 showed that plaintiff's "remote memory, language and calculations [were] intact" and his neurological examination was normal. (Tr. 227-28.) Psychiatrist Dr. Hahn did not diagnose any mental health issues using the multi-

axial system of assessment.[11] (Tr. 392.) Plaintiff reported to Dr. Polepalli in August and December 1990 that he was a student in a Caribbean medical program returning home for the holidays. (Tr. 237-38.) Further, two of plaintiff's treating physicians stated toward the end of the Development Period that plaintiff could return to work; in one of these cases, the note is addressed to Brooklyn Union Gas Company, possibly plaintiff's employer at that time. (Tr. 379, 386.) Finally, as the ALJ recognized, plaintiff had a "minimal to nonexistent" history of psychiatric treatment. (Tr. 316.) A "reasonable mind might accept [this] as adequate to support" the conclusion that plaintiff's post-traumatic stress disorder was not disabling. *Richardson*, 402 U.S. at 401.

The court recognizes that the newest version of the DSM — which, incidentally, was released *after* the ALJ's decision in this case — indicates that dysthymia (now classified as "persistent depressive disorder") is perhaps a more serious mental disorder than its initial classification suggested. *See DSM* 168-71; *cf. Ingram v. Barnhart*, 72 F. App'x 631, 635 (9th Cir. 2003)

---

[11] In this system adopted in an earlier version of the DSM, each axis refers to a distinct domain of information that may help clinicians plan and predict outcomes for mental disorders. *See Fonseca v. Colvin*, No. 12 CIV. 5527, 2014 WL 297488, at *6 n.10 (S.D.N.Y. Jan. 28, 2014) (citation omitted). "Axis I refers to clinical disorders and other conditions that may be a focus of clinical attention; Axis II refers to personality disorders and mental retardation; Axis III refers to general medical conditions." *Id.* Dr. Hahn did not diagnose any issues on the first two axes, but found generalized muscle aches on the third axis. (Tr. 392.)

(unpublished) ("As the ALJ did not identify [the claimant's] dysthymia or panic disorder as severe impairments, he necessarily did not fully consider the effects of the combination of [her] severe impairments."). However, the ALJ's's statement that dysthymia is a "low-level form of depression," while perhaps an inartful way to describe a serious psychological condition, is not entirely dissonant with the description provided in other medical sources. *See* Mayo Clinic, *Diseases and Conditions: Dysthmia*, http://www.mayoclinic.org/diseases-conditions/dysthymia/basics/definition/con-20033879 (characterizing dysthmia as "a mild but long-term (chronic) form of depression"); Dorland's Illustrated Medical Dictionary 550 (32nd ed. 2012) (noting that symptoms of dysthymic disorder can persist "for more than two years but are not severe enough to meet the criteria for major depressive disorder").

In fact, the ALJ credited plaintiff's mental health problems by recognizing that he suffered from post-traumatic stress disorder. (Tr. 315.) That he determined the disorder was not disabling does not establish that the ALJ did not consider plaintiff's mental health concerns. (Tr. 313, 316 ("[T]he claimant's alleged post-traumatic disorder was taken into consideration in the above residual functional capacity to give the claimant every benefit of the doubt with respect to his claim for disability benefits.").) Consequently, the court concludes

that substantial evidence supported the ALJ's determination that plaintiff's mental health issues were not disabling.

E.  The ALJ's Limited Discussion of Dr. C. Sharma's Report Does Not Warrant Remand

Plaintiff next argues that consideration of neurologist Dr. C. Sharma's report was impermissible because Dr. Sharma never appeared for cross-examination at an earlier proceeding. (Pl. Mot. at 5.) Defendant argues that the report could permissibly be considered but alternatively that even disregarding the report, substantial evidence supports the ALJ's residual functional capacity finding. (Def. Reply at 4-5.)

Dr. Sharma's disputed report has a somewhat tortured backstory. The report was drafted in July 1990 based on a June 1990 exam. (Tr. 183-86.) Dr. Sharma determined that plaintiff had no neurological impairment and a normal spine, and stated that plaintiff had no physical restrictions. (Tr. 185-96.) Because Dr. Sharma did not appear for cross-examination, a prior ALJ decision relying on his report was remanded in a December 1992 district court decision. (Tr. 244.) But the central concern here is the effect of a July 2011 Appeals Council decision that determined the claimant's May 30, 2008 redetermination by the SSA pursuant to *Stieberger* was "a new determination" because "the facts and issues have changed." (Tr. 425.) In that decision, the Appeals Council

held that "res judicata is not applicable for the period of May 1, 1989 through August 31, 1998." (*Id.*)

This determination permitted plaintiff a hearing before the ALJ who rendered the decision at issue in this case. In his decision, the ALJ's only consideration of Dr. Sharma's report came in a single sentence in a section detailing plaintiff's medical history. (Tr. 315.) The ALJ stated:

> Dr. C. Sharma wrote in a June 23, 1990 independent examination report that the claimant had no neurological deficits; used a cane but did not need one to ambulate; had a normal mental status; and his skull and spine were normal.

(*Id.*) Dr. Sharma's opinion was not further employed by the ALJ to buttress any of his conclusions.

The parties have inadequately briefed the issue of whether the district court's December 1992 decision excluding Dr. Sharma's report from consideration (to the extent of his unavailability for cross-examination) remained applicable after the Appeals Council's July 2011 remand. But it is unnecessary to untangle the complex procedural knot generated here by the interplay between the decades' worth of decisions rendered on plaintiff's entitlement to social security benefits and the *Stieberger* settlement. Even assuming the ALJ's consideration of the report was impermissible, the error was harmless. *See McIntyre v. Colvin*, 758 F.3d 146, 148, 152 (2d Cir. 2014) (applying harmless error test in social security context); Social Security Disability

Law & Procedure in Federal Court § 9:56 (collecting social security cases applying harmless error analysis).

Here, it could hardly be said that the ALJ relied on Dr. Sharma's report. The only citation to the report appears in the above-quoted single sentence and is not used directly to support any of the ALJ's conclusions. (Tr. 315.) In addition, the portion of Dr. Sharma's report noted by the ALJ was duplicative of — and indeed far less damaging to plaintiff's claim than — consulting neurologist Dr. Travis's report, which suggested that plaintiff was feigning his disability. (*See* Tr. 227 (noting "voluntary restriction of movement in all directions" during examination of neck and lumbar spine; characterizing plaintiff's gait as "very slow and somewhat bizarre" with alternate favoring of his left and right leg; and stating that examining physician was unable to detect "any organic disturbance to his gait"); *id.* at 228 (observing that plaintiff refused an x-ray).) Thus, if it was error for the ALJ to mention Dr. Sharma's report, such error was harmless. *See McIntyre*, 758 F.3d at 152; *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (finding harmless error where improperly "excluded evidence [was] essentially duplicative of evidence considered by the ALJ"); *Walzer v. Chater*, No. 93 Civ. 6240, 1995 WL 791963, at *9 (S.D.N.Y. Sept. 6, 1995) (holding error harmless where ALJ failed to discuss a treating physician's report because consideration of report would not have changed outcome).

F.  The ALJ's Decision to Give No Weight to Chiropractor Dr. Whittaker's Opinion Was Reasonable

Plaintiff's final argument is that the ALJ improperly accorded no weight to chiropractor Dr. Whittaker's reports because she was not an "acceptable medical source" within the meaning of 20 C.F.R. § 404.1513(a) and 20 C.F.R. § 416.913(a). (Pl. Mot. at 5; *see also* 20 C.F.R. § 404.1527(a)(2); 20 C.F.R. § 416.927(a)(2).) Defendant agrees that the ALJ accorded no weight to Dr. Whittaker's opinions, but argues that the ALJ's decision was justified because "[Dr. Whittaker's] objective findings did not support her opinion that plaintiff was unable to perform any work." (Def. Mot. at 1-2.)

When evaluating a claimant's disability, the ALJ performs a two-step analysis. First, the plaintiff must show a medically determinable impairment, which must be supported by evidence from "acceptable medical sources." *E.g.*, 20 C.F.R. § 404.1513(a). Second, assuming a plaintiff has shown an impairment, the ALJ must assess the severity and functional limitations of such impairments; in this inquiry, the ALJ can look to "other sources." *E.g.*, 20 C.F.R. § 404.1513(d).

Chiropractors are not "acceptable medical sources" qualified to opine about the existence or non-existence of a disability, but they are "other sources" whose opinions can be considered in evaluating the severity of a disability. *See* SSR 06-

03p, 2006 WL 2329939 (Aug. 9, 2006) (including chiropractors in a list of acceptable "other sources" within the meaning of §§ 404.1513(d) and 416.913(d)); *see also Weather v. Astrue*, No. 6:11-CV-00890 (N.D.N.Y. Nov. 5, 2012), ECF No. 18 ("Although [a chiropractor] is not considered an 'acceptable medical source' under the Social Security Regulations, his opinion may be considered as to the severity of Plaintiff's impairments . . . ."), *adopted by Weather v. Astrue*, 32 F. Supp. 3d 363, 378 (N.D.N.Y. 2012); *Losquadro v. Astrue*, No. 11-CV-1798, 2012 WL 4342069, at *14 (E.D.N.Y. Sept. 21, 2012) ("Although a chiropractor does not qualify as an 'acceptable medical source' and thereby cannot establish a medical impairment, a chiropractor is listed as an 'other source,' whose opinion should be considered in step two of the analysis.").

The weight to be accorded a chiropractor's opinion is a frequently litigated issue. *See* Social Security Disability Law & Procedure in Federal Court § 2:25 (collecting cases). In this circuit, in accordance with the regulations, ALJs are permitted to take a chiropractor's opinion into account, though they are not required to do so. *See Diaz v. Shalala*, 59 F.3d 307, 314 (2d Cir. 1995) (granting ALJs "discretion to determine the appropriate weight to accord the chiropractor's opinion based on all the evidence"); *Poole v. R.R. Ret. Bd.*, 905 F.2d 654, 662 (2d Cir. 1990).

Although the Second Circuit has not so held, these precedents strongly suggest that an ALJ cannot refuse to assign any weight to a chiropractor's opinion solely on the basis that the chiropractor is not an "acceptable medical source." *See Losquadro*, 2012 WL 4342069, at *16 ("[A]lthough an ALJ has the discretion to assign little weight to a chiropractor's opinion, the ALJ cannot do so solely because a chiropractor is not an acceptable medical source, but rather must still consider the opinion as an 'other source' under the applicable rules." (collecting cases)); *see also Sanfilippo v. Astrue*, 274 F. App'x 551, 553 (9th Cir. 2008) (remanding where ALJ rejected chiropractor's opinion exclusively on the grounds that he was not an "acceptable medical source"); 3 Soc. Sec. Law & Prac. § 37:87.

In determining how much weight to accord a chiropractor's opinion, an ALJ may consider:(i) how long the source has known the plaintiff and the frequency of treatment; (ii) how consistent the opinion is with other evidence; (iii) the degree to which the source presents relevant evidence to support an opinion; (iv) how well the source explains the opinion; (v) whether the source has a specialty or area of expertise related to the individual's impairment; and (vi) any other factors that tend to support or refute the opinion. *See* S.S.R. 06-03p.

Here, plaintiff contends that the ALJ gave "no weight" to Dr. Whittaker's opinion exclusively because she was not an

"acceptable medical source." (Pl. Mot. at 5.) A closer look at the opinion reveals otherwise. While the ALJ did state that Dr. Whittaker was not an "acceptable medical source," he considered and then discredited her opinion because her findings were "inconsistent with the medical evidence in the file" and at times even with her own findings. (Tr. 316.)

Dr. Whittaker treated plaintiff during two isolated phases of the Development Period, though she had treated him for some time during the early 1980s as well.[12] In July 1989, although she stated that plaintiff had total spinal impairment, she also stated that he was capable of performing semi-sedentary and sedentary work. (Tr. 148.) In addition, in May 1990 Dr. Whittaker reported that plaintiff was working (Tr. 147) and in June 1989 she noted that plaintiff had full ranges of motion in almost all extremities, albeit with some pain. (Tr. 143.) Dr. Whittaker examined plaintiff on January 4, 1991, and treated him on January 5 and 25, 1991. (Tr. 215-16, 220.) At that time, she characterized plaintiff as "totally disabled." (Tr. 220.) It was not inappropriate for the ALJ to take inconsistencies like these into account. *See Michels v. Astrue*, 297 F. App'x 74, 76 (2d Cir. 2008) ("'Consistency' is a factor in deciding the weight accorded to any

---

[12] Dr. Whittaker also treated plaintiff from February through November 1987, and from June 1988 to August 1989. (Tr. 218.)

medical opinion." (citing 20 C.F.R. § 404.1527(d)(4))); S.S.R. 06-03p.

During this same general timeframe early in the Development Period, plaintiff also conveyed to Dr. Polepalli that he was attending "pre-med" or medical school in the Caribbean. (Tr. 237-38.) *See Gay v. Sullivan*, 986 F.2d 1336, 1339 (10th Cir. 1993) (recognizing that school attendance "may be considered by the Secretary, along with medical testimony, in determining the right of a claimant to disability payments" (internal quotation marks and citation omitted)); *see also Giese v. Chater*, 56 F.3d 67 n.4 (7th Cir. 1995) (unpublished) (same); *Ewing v. Astrue*, No. 5:11-CV-01418, 2013 WL 1213129, at *6-7, 10 (N.D.N.Y. Mar. 22, 2013) (considering college course work); *Wellman v. Metlife Ins. Co.*, 674 F. Supp. 2d 449, 452-54 (W.D.N.Y. 2009) (taking graduate course work into account in evaluating plaintiff's claim for disability benefits under an ERISA plan). *But see Cohen v. Sec'y of Dept. of Health and Human Servs.*, 964 F.2d 524, 531 (6th Cir. 1992) (reversing denial of benefits where ALJ found school attendance determinative because such evidence, while probative, cannot end the inquiry). This further inconsistency between plaintiff's claimed disability and his medical education supports the ALJ's decision to give no weight to Dr. Whittaker's opinion.

After a six-year break in treatment, Dr. Whittaker again treated plaintiff toward the end of the Development Period in

February 1997. (Tr. 321, 330, 380.) Plaintiff apparently returned to Dr. Whittaker after a car accident on February 14, 1997. (Tr. 330.) Dr. Whittaker stated that it was not determinable whether this accident would result in permanent disability, but she went on to state that plaintiff had been permanently disabled since March 1983. (*Id.*) This problematic inconsistency further supports the ALJ's determination to give Dr. Whittaker's opinion no weight. Additionally, two of plaintiff's other treating physicians stated in March 1997 – shortly after the February 1997 car accident – and again in July 1998 that plaintiff could return to work. (Tr. 379, 386.) As noted earlier, one of these notes appears to be addressed to an employer. (Tr. 379.) Accordingly, it was not unreasonable for the ALJ to decide not to accord any weight to Dr. Whittaker's opinion.

## CONCLUSION

Substantial evidence supported the ALJ's decision that plaintiff was not disabled during the Development Period, either due to his cervical and lumbar degenerative disc disease or due to his post-traumatic stress disorder. Even if the court were inclined to reach "a different result upon a de novo review," the court may not "substitute its own judgment for that of the Secretary." *Williams*, 859 F.2d at 258. For the foregoing reasons, Defendant's motion for judgment on the pleadings is GRANTED and plaintiff's cross-motion is DENIED. The Clerk of Court is respectfully

requested to enter judgment in favor of Defendant and close the case.

**SO ORDERED**

_____/s/_____

Kiyo A. Matsumoto
United States District Judge

DATED:  Brooklyn, New York
        November 4, 2015